1

2

3

4

5

6

7

8           UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  **FEDERAL TRADE COMMISSION,**      )      **CASE NO. SACV 09-0977-**
                                     )      **DOC(MLGx)**
12              **Plaintiff(s),**         )
                                     )
13         **v.**                        )      **FINDINGS OF FACT AND**
                                     )      **CONCLUSIONS OF LAW**
14  **KAHRAM ZAMANI; INFINITY**        )
    **GROUP SERVICES, INC.,**          )
15                                     )
                **Defendant(s).**        )
16                                     )
                                     )
17                                     )
                                     )
18                                     )
                                     )
19  _____  )

20

21         This action was tried to the Court between September 14, 2010 and October 4, 2010.

22  Pursuant to the Rule 52 of the Federal Rules of Civil Procedure, the Court hereby issues its

23  findings of fact and conclusions of law.

24  **I.    EVIDENTIARY DISPUTES**

25         1.    The Federal Trade Commission ("FTC") seeks the admission of consumer

26               declarations that were prepared and submitted in accordance with 28 U.S.C.

27               § 1746 (unsworn declarations under penalty of perjury).  These declarations are, as

28               the FTC concedes, hearsay.  See Pl.'s Mtn. In Limine (Docket 98), at 4:3-7.  The

declarations are nonetheless admissible because they have "circumstantial guarantees of trustworthiness" and it would be unduly consumptive of time and burdensome for the FTC to call each aggrieved consumer into Court to testify in person. See Fed. R. Evid. 807. The consumer declarations identify the declarants with specificity and recite similar factual accounts about the consumer-declarants' experiences with Infinity Group Services ("IGS") during the time period at issue in this lawsuit. The Ninth Circuit has recognized, in identical circumstances, that the consumer complaints are admissible under Rule 807 because "[t]he fact that they all reported roughly similar experiences suggests their truthfulness." FTC v. Figgie Int'l, Inc., 994 F.2d 595, 608-09 (9th Cir. 1993). The consumer declarations (Exs. 98-100, 102-112) are accordingly received into evidence.

2. The FTC also seeks the admission of a number of consumer letters filed on the FTC's website. In those letters, consumers complain about IGS' failure to timely obtain loan modifications and/or loan refinancing on behalf of its clients. The vast majority of the consumer complaints describe IGS' business operation – its fees, services, and performance – in nearly identical terms. Such "report[s] [of] roughly similar experiences suggests the[] truthfulness" of the letters on the FTC's website. See id.; see also FTC v. Magazine Solutions, LLC, No. 7-692, 2009 WL 690613, at *1 (W.D. Pa. Mar. 16, 2009) (admitting consumer complaints to Better Business Bureau in part because "[t]he consistency of the representations [described in the consumers' letters] reinforces the trustworthiness of the complaints"). During trial, the Court identified the factual parallels between the consumer complaints admitted in Figgie and those the FTC seeks to admit here. However, the FTC was cautioned to make clear, through electronic identifying information, that the consumer complaints were submitted by different individuals, instead of a single disenchanted IGS customer committed to flooding the internet with his complaints. The FTC made that showing, and the consumer complaints are therefore admitted.

## II.    PROCEDURAL HISTORY

1.     On September 9, 2010, the Court granted in part and denied in part the FTC's motion for summary judgment on its claims against Kahram Zamani ("Zamani") and his California corporation Infinity Group Services, Inc. d/b/a IGS, Hope to Homeowners, ASKIGS, and ASKIGS, Inc. ("IGS"), for violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The FTC's August 26, 2009 Complaint separately alleges three "counts" or violations of Section 5(a).

2.     The Complaint's first count alleges that Zamani and IGS (collectively "Defendants") falsely represented to consumers that they would "obtain a loan modification in all, or virtually all, instances." Compl. ¶ 33. The FTC alleged that misrepresentations were made in the course of advertising, marketing, promoting, offering for sale, or actually selling mortgage loan modification services to customers in the United States and, more specifically, the state of California. Id.

3.     The Complaint's second count alleges that, in connection with the sale of these loan modifications services, Defendants falsely promised consumers "full refunds . . . if Defendants fail[ed] to obtain modifications of their loans." Id. ¶ 36. These misrepresentations were likewise made in advertising, marketing, promotional, and other materials that offered for sale, or actually consummated the sale, of mortgage loan modification services. Id.

4.     The Complaint's third count alleges that Defendants falsely represented to consumers that they would "obtain refinancing for consumers' mortgage loans for an up-front flat fee of [nine-hundred and ninety five dollars]." Id. ¶ 39. These misrepresentations, like the first two categories of alleged misrepresentations, were made in Defendants' advertising, marketing, promotional, and other materials that offered for sale, or actually consummated the sale of, mortgage loan refinancing services. Id.

5.     The Court's order on the motions for summary judgment concluded that the undisputed facts established liability as to IGS on all three counts. See Docket 105 at 9:27-12:10. The Order also concluded that the undisputed facts established

Zamani's liability on the third claim for misrepresentations made in connection with the sale, or offering for sale, or mortgage loan refinancing services.  Id. at 12:11-13:3.  The remaining disputed issues to be resolved at trial were (1) Zamani's liability on the Complaint's first two counts; (2) the remedies, including injunctive, restitutionary, and equitable relief that should flow from Defendants' conduct.  See id. at 13:15-15:14.

## III.   FINDINGS OF FACT

1.   Zamani is the founder and Chief Executive Officer of IGS, a California corporation.  Like IGS, Zamani is a resident of California.  See Stipulated Fact Nos. 1-7, Proposed Pre-Trial Conference Order (Docket 96-1), at 3-4.

2.   Between 2008 and 2009 IGS advertised its services to mortgagees whose loans were subject to high interest rates.  Between November 1, 2008 and early February 2009, IGS offered a service named "Hope to Homeowners" pursuant to the Economic Stabilization Act of 2008 (the "Act").  The Act authorized the Federal Housing Authority (FHA) to guarantee certain classes of home loans that lenders refinanced in order to relieve borrowers burdened by high interest rates.  The government program was called "Hope for Homeowners"; it insured refinanced loans that satisfied the following conditions among others: (a) the principal balance could not exceed ninety percent of the home's value; (b) the refinanced loan amount could not exceed $550,440; (c) the Federal Housing Authority would be entitled to a share of any equity eventually realized in the subject property.  See Bush Administration Launches "Hope for Homeowners" Program to Help More Struggling Families Keep Their Homes (Exhibit A to Trial Ex. 444).

3.   IGS marketed the Hope to Homeowners service as an off-shoot of the program sponsored by the federal government.  It paid a prominent Southern California radio station to advertise Hope to Homeowners as "the only program available that can reduce your principal balance, and for some, up to 50 percent."  Trial Ex. 162A; see also Trial Ex. 163A (similar advertisements).  The advertisements for

the Hope to Homeowners program were created on November 4, 2008, December 11, 2008, and December 12, 2008, and aired thereafter. Id. Early advertisements aired in November 2008 purported to describe the government program and instructed interested consumers to call IGS' toll free number. See, e.g., id. at 3. Radio station employees reminded each other that, at least one version of the advertisement, "[Zamani] would like to leave his company name out and just focus on the program." Id. at 7. Given the near identity between the name of the government program ("Hope for Homeowners") and the product marketed by IGS ("Hope to Homeowners"), the Court finds that IGS was intentionally trying to confuse consumers into believing that the radio advertisements were sponsored by the federal government when, in fact, they were not. See id.

4.	In December 2008, IGS altered the text of its radio advertisements slightly. Each advertisement now included a statement that "no mortgage modification company or law firm can guarantee a reduction in your principal loan balance, period!" Id. at 1. That statement immediately followed the claim that "this is the only program available that can reduce your principal balance." See id.

5.	Potential customers called an IGS hotline monitored by sales representatives. These sales representatives generally gathered identifying financial information and purported to express an opinion about the customers' eligibility for the government-sponsored Hope for Homeowners program. See, e.g., Andrew Carlson Decl. (Trial Ex. 102) ¶ 3. In a pre-printed form, IGS represented to potential customers that IGS would contact each customer's lender and negotiate a loan modification. See, e.g., Hope to Homeowners Fee Acknowledgment, Ex. B to Robert Millspaugh Decl. (Trial Ex. 108).

6.	In addition to generally providing each potential customer with a preliminary opinion about her eligibility for a government-insured refinanced loan under the Hope for Homeowners program, IGS' sales representatives also solicited an initial payment of $995.00 from customers interested in engaging IGS' services:

representing customers in "negotiations" with their lenders.  IGS presented its customers with paperwork making clear that the $995 fee was a non-refundable amount charged "in consideration for an evaluation by [IGS] of the borrowers' [sic] financial condition.  The evaluation is to determine the suitability of the borrower for the selection of one or more of the actions identified above and is completed prior to a presentation of any request(s)."  Id.  The form further clarified that "[IGS] will use its best efforts in making the presentations, but there are no express or implied guarantees."  Id.  Of course, IGS could make no guarantees because (as its pre-printed forms made clear) "[t]he decision to modify any term of the borrower(s) existing mortgage can only be approved by their Lender/Servicer/Investor."  Id.  IGS, in short, charged customers $995 to compile their financial information and solicit a loan modification from their lenders.

7.      IGS received hundreds of phone calls from potential customers about its Hope to Homeowners service.  See, e.g., Trial Ex. 432 (listing 219 phone calls on January 12, 2009 alone); see also Testimony of Kahram Zamani, dated September 14, 2010, at 10:5-22 ("I would estimate that on average IGS received anywhere between 150 to 200 calls . . . [p]er day.").

8.      Many customers claimed that oral representations made by IGS' customer service representatives contradicted the disclaimers in its forms.  Several customers complained to the Better Business Bureau (BBB) that IGS "first ask[s] you for an upfront fee of $995 and indicate[s] that it is 100% refundable if they cant' get the job done."  See Better Business Bureau Complaint Details, Kevin Millspaugh (Trial Ex. 122); see also Better Business Bureau Complaint Details, Jennifer Aggers ("Infinity Group took $995 with the promise to modify my mortgage."); Better Business Bureau Complaint Details, Irene Marcellus ("I agreed to send them all my personal information and a check for $995 [w]ith a promise that if the loan could not get modified the money would be refunded back to me."); Better Business Bureau Complaint Details, Yolanda Farriola-Delahanty ("After many

6

conversations including promises that they would refund the $995 my husband and I signed up.").[1]  Other customers complained that IGS represented that their loan modification was a "done deal," even before contacting the lender to seek approval.  See, e.g., Better Business Bureau Complaint Details, Henry Kimari; Trial Tr., dated September 14, 2010, Vol. II, at 60:15-19.  Both sets of customers purportedly expected that the $995 up-front fee guaranteed a successful loan modification, and that, if IGS failed to persuade a customer's lender to change loan terms, it would refund the customer the $995 fee.  Zamani, and other senior members of IGS' management team, were aware that the company's sales representatives misrepresented to consumers the terms of IGS' services, including the Hope to Homeowners program.  See, e.g., Trial Ex. 159 (discussing "classic . . . bait and switch" tactic employed by IGS employee).  These sales representatives were not promptly disciplined and, in many cases, were not disciplined at all.  However, in certain circumstances, IGS submitted documentation to lenders in connection with a requested loan modification but failed to receive a timely response (if any) from these lenders.  See Trial Tr., dated September 14, 2010, Vol. II, at 34:17-35:5; 35:21-25-36:3.

9.      IGS points to its written disclaimers as evidence that it never promised either

---

[1] One IGS customer testified at trial that IGS' radio advertisement "says that [the cost of the program] was 995, and they would give you your money back if they couldn't get a loan modification.  And I felt confident that they could do it because I probably trusted KFI station because I listen to it so much."  Testimony of Irene Marcellus, dated September 15, 2010 (Docket 120), at 56:11-15.  This testimony does not square with the actual text of IGS' Hope to Homeowners advertisements, none of which promised a refund of the $995 up-front fee in the event IGS failed to successfully obtain a loan modification from the customer's lender.  See Trial Ex. 161.  The same customer further testified that, in its radio advertisements, IGS proclaimed that it "ha[d] done so many [modifications] and that they pay the money back if they don't — if they can't get it done," see Trial Tr., dated September 15, 2010, Vol. I, at 73:24-74:2, but this representation is also contradicted by the undisputed text of the radio advertisements.  The Court disregards the customer's testimony as not credible.

successful loan modifications or a refund of the $995 up-front fee in the event of failure.  But IGS does not dispute that the $995 fee minimally secured a thorough evaluation of the customer's eligibility for the government-sponsored Hope for Homeowners program as well as a committed representation of the customer in discussions with the lender.  Several customers complained that IGS failed to perform even these tasks.  See, e.g., Better Business Bureau Complaint Details, Yolanda Farriola-Delahanty ("I called my bank last week and they have not heard from [IGS] until yesterday."); Better Business Bureau Complaint Details, Antonia Rogers ("[N]o one from IGS contacted my bank to make sure that they had everything" after the bank initially requested additional documentary information); Better Business Bureau Complaint Details, Chris & Crystal Allen ("[IGS service representative] said he would contact [] our lender on our behalf to work with them and re-negotiate our loan.  To this day, he has never contacted [the lender] on our behalf."); see also E-mail from Kenji Taylor to Gary D. Kennedy, dated June 3, 2009 (Trial Ex. 123) ("In a phone call to Bank of America Home Loans on May 14, I was told they had had no contact from IGS on our behalf.  Other than a letter signed by us authorizing them to talk to IGS about our loans on the Morrison house, B of A has not received any other documentation from IGS."); Testimony of Irene Marcellus, dated September 15, 2010 (Docket 120), at 68:14-16 ("I called my bank, and they never heard of these people.  They never received a letter from these people.  They never received anything from these people.").  Zamani was aware of the complaints in February of 2009.  See Trial Exs. 155-158 (internal IGS email communications between Zamani, et al. discussing consumer complaints arising out of Hope to Homeowners); see also Trial Tr., dated September 14, 2010, Vol. I at 66:17-19.  The task of reviewing consumer complaints was delegated to IGS Chief Financial Officer Brian Goshert, who, along with Zamani and the company's vice president, decided whether to refund complaining customers' initial $995 payment.  See id. at 46:14-17; id. at 68:22-23.

10. IGS failed to promptly respond to its customers' phone calls and e-mail correspondence and ultimately failed to obtain a single loan modification on behalf of any of its customers. See, e.g., E-mail from Kenji Taylor, dated April 8, 2009 (Trial Ex. 123) ("Still waiting for a response from someone. PLEASE. Thanks"). Instead, some IGS processors and sales representatives falsely represented that IGS had succeeded in convincing lenders to modify loan terms. Trial Tr., dated September 14, 2010, Vol. II, at 109:1-7.

11. However, Zamani did not direct his representatives to refund, or even promise to refund, the $995. Zamani instead informed customers that, while IGS could not refund the up-front fee, it would "continue to work on [their] file[s] and work diligently to seek a resolution from [their] lender[s]." See, e.g., E-mail from Kahram Zamani to Irene Marcellus, et al., dated April 18, 2009 (Trial Ex. 438).

12. Disgruntled IGS customers lodged complaints with the BBB and the Consumer Sentinel Network in droves. See Trial Exs. 121-122. IGS was faulted for making false promises of success in order to induce customers to purchase its product, only to undertake lackadaisical efforts (if any) to successfully negotiate loan modifications. See id. IGS formally responded to at least one of the complaints by noting that "[the customer] was aware that there were not guarantees that IGS could save her home or modify her loan." See Trial Ex. 122 at 4. In another instance, IGS and the customer disputed to the BBB whether IGS had undertaken to seek a Hope for Homeowners loan modification from the customer's lender without first investigating and discovering the fact that the customer's lender did not participate in the government program. See id. at 26 ("If IGS would have contacted [the lender] when they originally received my package they would already know this. Instead they waited until I became the squeaky wheel and pushed for resolution."). In response to another complaint, IGS stated that it would continue making efforts to "get the modification" from the complaining customer's lender. Id. at 28.

13. In response to frequent customer complaints between December 2008 and January 2009, IGS ceased the "Hope to Homeowners" service in early February 2009. As a result of the termination, IGS no longer communicated (or purported to communicate) with lenders on behalf of borrowers seeking a modification of loan terms. <u>See</u> Testimony of Kahram Zamani, dated September 14, 2010, at 19:1-8. The program was also terminated because IGS was "having a hard time getting the lenders to" respond to requests to modify the terms of borrowers' mortgage loans. <u>See</u> Trial Tr., dated September 14, 2010, Vol. II, at 37:14-17.

14. Approximately 1500 customers signed up for the Hope to Homeowners program and paid the $995 up-front fee. <u>See</u> <u>id.</u> at 47:4-11. None of the 1500 customers successfully obtained a Hope to Homeowners modified loan. <u>Id.</u> IGS refunded approximately 700 of these 1500 customers with their $995 up-front fee. <u>Id.</u> at 47:12-15. The remaining customers were not refunded their up-front fee because "at the time of [IGS'] bankruptcy," there were hundreds of "files that were still active as loan modifications" and remaining files "ultimately got denied" by the customers' lenders. <u>See</u> <u>id.</u> at 47:18-24.

15. IGS began offering a mortgage refinance service in the wake of the Hope to Homeowners program. Trial Tr., dated September 14, 2010, Vol. I, at 21:20-22. The service built upon a product already being offered by IGS. <u>See</u> Trial Tr., dated September 14, 2010, Vol. II, at 43:13-18; 45:5-7. Unlike the Hope to Homeowners program, which depended upon lenders' willingness to modify the terms of borrowers' loans, IGS' mortgage refinance product required minimal participation by third parties. IGS paid a prominent Southern California radio station to advertise the refinance service in the following manner:

JOHN KOBEL: Hi, John Kobel here with the deal of a lifetime for all homeowners with equity. My friends over at IGS, mortgage bankers, are writing loans at ridiculous rates. Today, you can lock in a 30-year fixed rate at 4.625 percent. 4.625 percent. You pay IGS a

flat fee of $995. No title, no escrow fee, no appraisal fee, no junk

fees. Pursuant to Cal Finance Lenders License. 4.721 percent APR.

Restrictions apply. Call 888-827-5447, 888-827-5447.

See Trial Ex. 163A at 15.

16.  Between February 2009 and March 2009, radio advertisements for IGS' mortgage refinance service made similar promises about the certainty of a low-interest mortgage loan upon payment of an up-front $995 fee. See, e.g., id. at 16 (promising 4.375 percent loan for $995 flat fee); id. at 17 (promising 4.5 percent loan for $995 flat fee); id. at 18 (promising 4.25 percent loan for $995 flat fee); id. at 19 (promising 4.25 percent loan for $995 flat fee); id. at 20 (promising 4.375 loan for $995 flat fee). Prospective customers were directed to call a toll-free number, which would "route the call to [IGS'] sales department and [eventually] to an [IGS] agent." Trial Tr., dated September 14, 2010, Vol. II, at 22:2-5. Prospective customers listened to, and relied upon, these advertisements. See Trial Tr., dated September 14, 2010, Vol. II, at 14-21.

17.  IGS, at the direction of Zamani, trained sales representatives and processors in connection with the new loan refinance service. See id. at 20:18-20. This training enabled the sales representatives to solicit applicable financial information from customers interested in a mortgage refinance, inputting that information into a loan prospector computer program called "Freddie Mac LP" and receiving the software's determination of whether the prospective customer was "eligible" for a refinanced loan. See id. at 22:22-23. Following this initial determination of the customer's eligibility for a refinanced mortgage at specified loan terms, IGS would "advise the customer how the process would work." Id. at 25:5-6. "For example, the loan would be assigned to a team leader/manager for quality control review" and later "submitted to [IGS'] setup department" in order to finalize the transaction by sending the customer required disclosures, including a good faith estimate, Truth in Lending Act Disclosure Statement, and other disclosures required by the

1    Real Estate Settlement Procedures Act.  <u>Id.</u> at 25:7-17.

2    18.  IGS had been extended a line of credit by First Tennessee Bank, National

3    Association with a credit limit of approximately $15 million.  <u>See</u> Trial Tr., dated

4    September 14, 2010, Vol. I, at 113:6-9.  IGS expected to, and did, draw down on

5    that line of credit in order to lend money to refinance customers.  <u>See</u> <u>id.</u> at 112:18-

6    25.  But because the line of credit was insufficient to finance loans for the

7    thousands of prospective customers who sought refinanced loans from IGS, IGS

8    "flipped" or sold loans that it funded to larger lenders, predominantly Citibank.

9    <u>See</u> <u>id.</u> at 112:16-17; <u>see also</u> <u>id.</u> at 114:1-3, 13-25; 116-15-19.

10   19.  IGS ordinarily sold loans to Citibank within three to five days.  <u>See</u> <u>id.</u> at 48:17-18.

11   But the company was not so prompt in processing the loans prior to funding.

12   Between February 2009 and May 2009, IGS' processors were delinquent in

13   processing loan applications.  <u>See, e.g.,</u> <u>id.</u> at 118:12-17.  Processors avoided

14   consumers' phone calls and made false representations in response to persistent

15   consumers.  <u>See</u> <u>id.</u> at 118-120.  IGS' dilatory conduct ultimately interfered with

16   its ability to provide loans to customers at promised rates, and the company was

17   unapologetic about its failures.  <u>See</u> <u>id.</u> at 120:4-11.  IGS failed to refund most

18   customers with their $995 up front fees or even the variety of additional "surprise"

19   fees that IGS charged as incident to the loan origination process.  <u>See</u> <u>id.</u> at 131:2-

20   19, 135:2-6.

21   20.  In June 2009, Citibank instituted a program called the "Quality First Initiative"

22   that prescribed a longer examination of loans prior to their purchase and, therefore,

23   delayed IGS' ability to sell a fully funded loan to Citibank by approximately 29

24   days.  <u>See</u> <u>id.</u> at 50:1-3.  The delay in time interfered with IGS' ability to deliver

25   promised loan terms, including interest rates, to its customers.  <u>See</u> <u>id.</u> at 50:7-9.

26   Zamani and another IGS executive pled with Citibank to purchase loans at a faster

27   rate, but to no avail.  <u>See</u> <u>id.</u> at 51:8-25-52:7.  As a result, IGS was "unable to fund

28   loans to customers that" it had "issued loan doc[uments] to."  <u>Id.</u> at 10-12.

Customers who had invested not only the $995 up-front fee but hundreds of additional dollars in appraisal fees and other fees associated with documenting the loan transaction were left dissatisfied. <u>See, e.g.</u>, <u>id.</u> at 82:2-12. Some were eventually informed that IGS could not longer honor the promised loan terms, including the critical terms associated with the applicable interest rates. <u>See id.</u> at 82:24-83:7.

21. Instead of candidly explaining the situation to customers or taking responsibility for IGS' failure to fund loans at promised rates, some IGS sales representatives and processors responded to customers' complaints with indignance. <u>See id.</u> at 83:16-24 ("And he basically said, well, just because you signed loan documents doesn't mean that that's a guarantee that you are going to be funded."). This behavior was not directed by IGS executives, who attempted to accommodate disgruntled customers even if that meant that IGS would suffer a loss on the transaction. <u>See, e.g.</u>, <u>id.</u> at 86:9-87:23 (describing transaction in which IGS agreed to fund customer's refinanced loan at lower-than-market rate by using $995 up front fee to purchase "points" and lower interest rate with promise that IGS would refinance loan at no charge if prevailing interest rates continued to decrease).

22. IGS' vice president, Tyrone De Wale, was aware of the consumer complaints IGS received in connection with both the Hope to Homeowners program and the mortgage refinance service. Though Mr. De Wale testified that he did not learn about consumer complaints until at least April 2009, that testimony is not credible for two reasons. First, e-mail communications demonstrate Mr. De Wale's knowledge about consumer complaints in February 2009. <u>See, e.g.</u>, Trial Ex. 157. Second, Mr. De Wale was well aware of the poor performance of the Hope to Homeowners program in December 2008, January 2009, February 2009, and March 2009, and even prepared a chart detailing the customer complaints received by IGS. <u>See</u> Trial Tr., dated September 14, 2010, Vol. II, at 145:2-146:5; <u>see also</u>

Trial Ex. 101.

23.    Zamani was likewise aware of the growing customer complaints as early as
       February 2009 because Mr. De Wale was aware of the complaints and it was
       common practice for Zamani and De Wale to correspond about such issues,
       including customer complaints in particular.  See id. at 154:18-155:2 (claiming that
       he did not "recall" speaking with Zamani about customer complaints but
       acknowledging that he would have ordinarily discussed the subject with Zamani);
       see also Trial Ex. 156 (e-mail communication with carbon copy to De Wale noting
       that IGS "need[s] to come to some sort of plan so we do not have 100 complaint
       calls a day.").  Moreover, senior employees at IGS, including individuals who had
       close professional and personal relationships with Zamani, were apprised of
       consumer complaints in January 2009.  See Trial Tr., dated September 15, 2010,
       Vol. II, at 27:15-28:7; see also Trial Ex. 74.

24.    However, even Zamani's fellow IGS executives admit that no attempt was ever
       made to be completely forthright with complaining customers about IGS'
       complicated relationship with larger lenders; instead, IGS planned to present
       clients with two choices: (1) "fund[ing] at the prevailing rate" with a promise to
       refinance upon a decrease in rates; or (2) "wait, and if the rates come down . . .
       refund [] at that rate."  Trial Tr., dated September 15, 2010, Vol. I, at 12:15-24.
       Indeed, IGS continued to ward off customer complaints by promising that loans
       would be funded, even when all objective indicators suggested otherwise.  Id. at 8-
       15.  Between February 2009 and May 2009, IGS held regular meetings at which
       executives of the company, including Zamani, discussed consumer complaints and
       chargeback requests.  Id. at 41; see also Trial Tr., dated September 15, 2010, Vol.
       II, at 20:17-21:10.

25.    Nor did IGS rein in its marketing between April 2009 and May 2009, despite the
       knowledge that it lacked the ability to fund the refinanced mortgages it promised
       prospective customers.  See Trial Ex. 23 ("It is no secret that our lines are at

14

capacity."); <u>see also</u> Trial Tr., dated September 15, 2010, Vol. I, at 32:14-21; 33:2-10. Though it is "common" for lines of credit to be at capacity for some period of time, <u>id.</u> at 47:17-22, IGS was aware that its lines of credit were at capacity because of a fundamental change in Citibank's policy concerning the purchase of mortgage loans. Given its awareness of that policy, it should not have continued to promise customers refinanced loans at low interest rates.

26.    IGS served approximately 1641 customers in connection with the Hope to Homeowners program and approximately 686 customers in connection with the mortgage refinance service. <u>See</u> Trial Tr., dated September 14, 2010, Vol. II, at 173:17-22. It generated approximately $2,733,022 in revenue from those customers. <u>See id.</u> at 172:19-21. Chargebacks accounted for approximately $629,933, leaving IGS with net revenue of approximately $2,103,099, not accounting for voluntary refunds. <u>See id.</u> at 172:22-173:2.

27.    Zamani was intimately involved in the operations of IGS. He spent approximately 16 hours a day at the office, held routine management level meetings, directed fellow executives and admitted to having a "hands on" approach with employees. <u>See</u> Trial Tr., dated September 14, 2010, Vol. I, at 94:2-5.

## IV.    CONCLUSIONS OF LAW

1.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), proscribes unfair business practices or acts. <u>See</u> <u>FTC v. Gill</u>, 265 F.3d 944, 955 (9th Cir. 2001). In general terms, "an unfair practice or act is one that '[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'" <u>FTC v. Neovi, Inc.</u>, 604 F.3d 1150, 1155 (9th Cir. 2010) (quoting 15 U.S.C. § 45(n)).[2]

_____

[2] Section 12 of the Act defines unfair business practices or acts to include "[t]he dissemination or the causing to be disseminated of any false advertisement." 15 U.S.C.

2.     Both "causation" and "substantial injury" go uncontested.  "To establish
substantial injury under Section 5 of the FTC Act, the FTC must show that
'consumers were injured by a practice for which they did not bargain.'" FTC v.
Neovi, Inc., 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008), aff'd 604 F.3d 1150 (9th
Cir. 2010) (quoting FTC v. J.K. Publ'ns. Inc., 99 F. Supp. 2d 1176, 1201 (C.D.
Cal. 2000)).  IGS sales agents and processors misrepresented the (1) success rate
of the Hope to Homeowners program; (2) recoverability of the $995 up-front fee
associated with the Hope to Homeowners program; and (3) rates and terms of
mortgage loans available under the IGS mortgage refinance service.  These same
sales agents and processors perpetuated these claims when actual IGS clients
called to complain about the service, causing consumers to not only pay the up-
front fees and other processing fees, but also forego the opportunity to enter into
favorable loan agreements with other brokers and lenders in the market.  The
burden suffered by IGS customers that called the company repeatedly for updates
about their accounts is substantial enough.  See FTC v. Accusearch Inc., No.
6:CV105-D, 2007 WL 4356786, at * 18 (D. Wyo. Sept. 28, 2007).  Substantial
injury was also felt by customers that paid the $995 up-front fee with the
expectation that the payment would secure a loan modification or loan refinance at
specified terms.  J.K. Publ'ns., 99 F. Supp. 2d at 1201.  These substantial injuries
would likely have been avoided if IGS had been forthright with both prospective
customers and actual clients about the success of its Hope to Homeowners and
mortgage refinance services.

3.     These injuries were not reasonably avoidable, not least because the company

§ 52(b).  A "false advertisement" is "an advertisement, other than labeling, which is
misleading in a material respect; and in determining whether any advertisement is
misleading, there shall be taken into account (among other things) not only
representations made or suggested by statement, word, design, device, sound, or any
combination thereof, but also the extent to which the advertisement fails to reveal facts
material in light of such representations . . ." Id. § 55(a)(1).

16

refused to be forthright with its clients, thereby inducing them to continue riding a sinking ship. The continued misrepresentations by both sales agents and loan processors — some of which found their way into IGS' advertisements — deprived customers of a "free and informed choice that would have enabled them to avoid the unfair practice." Id. (citations omitted). As a result, the "injury was not reasonably avoidable." Id.; see also Neovi, 598 F. Supp. 2d at 1115.

4. Competition and the consuming public did not benefit, but in fact suffered, as a result of the misrepresentations by IGS' sales agents and processors. "This prong of the test is easily satisfied 'when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition.'" Id. at 1116 (quoting J.K. Publ'ns, 99 F. Supp. 2d at 1201). The misrepresentations about IGS' services benefitted the company's sales but produced little benefit to competition or consumers. Instead, information disseminated by IGS sales agents and processors deterred consumers from using other brokers and lenders that offered superior services at a lower cost. The injury therefore extended beyond the consumers burdened with unnecessary fees and deprived of superior mortgage transactions to other market participants.

5. The FTC seeks the imposition of injunctive relief against IGS and Zamani for the unfair business practices and acts committed by IGS' employees.[3] The imposition of injunctive relief is governed by Section 13(b) of the FTC Act, which provides that "in proper cases, the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); see also FTC v. H.N.

---

[3] IGS filed for bankruptcy and the parties have briefed the issue of whether the commencement of those bankruptcy proceedings operates as an automatic stay pursuant to 11 U.S.C. § 362. The FTC has argued that this action cannot be stayed because section 362 excepts claims "by a governmental unit." Id. § 362(b)(4). That argument is contrary to law, and the Court has discretion to stay the entry of judgment even after reaching appropriate findings of fact and conclusions of law. See In re First Alliance Mortg. Co., 264 B.R. 634, 652 n. 18 (C.D. Cal. 2001).

Singer, Inc., 668 F.2d 1107, 1110-11 (9th Cir. 1982).  To determine the scope of any injunctive relief, the court is not bound by "the traditional equity standard" that governs equitable remedies.  See FTC v. Warner Communications, Inc., 742 F.2d 1156, 1159 (9th Cir. 1984).  Section 13(b) deliberately permits the entry of "broad" injunctions, including occupational bans, so that courts can "prevent transgressors from violating the law in a new guise."  FTC v. Wolf, 1996 U.S. Dist. LEXIS 1760, at *2 (S.D. Fla. 1996) (citing FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952)).  The Supreme Court has recognized that the FTC "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past."  FTC v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965).  Two factors traditionally guide a court's exercise of its discretion to enter injunctive relief pursuant to Section 13(b): (1) "the deliberateness and seriousness of the present violation," and (2) "the violator's past record."  Sears, Roebuck & Co. v. FTC, 676 F.2d 385, 392 (9th Cir. 1982).

6.    If both factors favor the entry of injunctive relief against a corporate entity, such injunctive relief may apply with equal force against corporate officers if "the individual defendants participated directly in the acts or practices or had authority to control them."  FTC v. American Standard Credit Sys., Inc., 874 F. Supp. 1080, 1087 (C.D. Cal. 1994) (citing FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573 (7th Cir. 1989), cert. denied, 493 U.S. 954, 110 S.Ct. 366 (1989)); see also Neovi, 598 F. Supp. 2d at 1117.  "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy."  American Standard Credit Sys., 874 F. Supp. at 1089.  "An individual's status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control."  Neovi, 598 F. Supp. 2d at 1117 (citing Publishing Clearing House, 104 F.3d at 1170).  It is undisputed, and the evidence clearly establishes, that Zamani, a Chief Executive Officer who was intimately involved in the operation of his company, had

authority to control representations made by the sales agents and processors that he failed to terminate or seriously discipline, even in the face of escalating consumer complaints. Zamani also participated directly in the development of IGS' radio advertisements for its mortgage refinance service. Thus, Zamani is liable for injunctive relief to the same extent as IGS.

7. Neither of the factors identified in Sears, Roebuck & Co. favor enjoining IGS from providing mortgage modifications services like the Hope to Homeowners program. **First**, the misrepresentations concerning the Hope to Homeowners program were not deliberate, especially because the virtues of the related government program ("Hope *for* Homeowners") were widely touted throughout the mortgage industry, and by the government itself. IGS, like other brokers, expected lenders to modify loan terms and eventually discovered that the opposite was true. Some IGS sales agents may have also promised to refund unsuccessful customers their $995 up-front fees, but there is no evidence that this was a deliberate practice by the company; to the contrary, the written contracts IGS used in connection with the Hope to Homeowners program clearly instructed customers that the $995 fee was not refundable. **Second**, the FTC adduced no evidence to prove that IGS had a record of engaging in misrepresentations prior to the financial crisis in 2008 and 2009. The evidence was to the contrary. See Trial Tr., dated September 14, 2010, Vol. II, at 62:20-63:7 ("I went on the Better Business Bureau [website], because they had a little logo on their website. So I clicked on that and looked that they had an A."); see id. at 68:14-19 (noting that IGS rating fell from A to D between January and March 2009). Through years of operating in the mortgage industry, seeking modifications from lenders on behalf of customers and refinancing loans, IGS never faced the kind of consumer revolt it faced in connection with the ill-fated Hope to Homeowners program. The Court accordingly denies the FTC's request for the entry of injunctive relief against IGS and Zamani in connection with the provision of mortgage modification services.

8.      The <u>Sears, Roebuck & Co.</u> factors also weigh against enjoining IGS, and therefore Zamani, from continuing to provide mortgage refinancing services. The FTC faults IGS for making representations in its advertisements about the provision of refinanced loans at specified rates, but those representations were, for the most part, not deliberately false. The unprecedented credit crisis that affected banks in the United States, including CitiBank, hobbled lenders like IGS from continuing to sell loans on the secondary market. Though IGS erred by failing to pare back its own advertising in response to the crisis, its executives, including Zamani, nevertheless attempted in vain to encourage CitiBank to purchase loans that IGS had accumulated on its line of credit. The absence of scienter is further corroborated by IGS' subsequent efforts to accommodate customers by offering loans at interest rates that would (and eventually did) result in losses to IGS. <u>See, e.g.</u>, Trial Tr., dated September 14, 2010, Vol. II, at 86-87. Because IGS' struggles with the mortgage refinance service were unprecedented for the company, the second <u>Sears, Roebuck & Co.</u> factor likewise disfavors the entry of injunctive relief. <u>See</u> ¶ IV(4), <u>supra</u>. The Court accordingly denies the FTC's request for the entry of an injunction that prevents IGS and Zamani from continuing to offer mortgage refinancing services.

9.      Narrower injunctive relief is nevertheless proper. Though IGS did not deliberately engage in misrepresentations about the Hope to Homeowners program and mortgage refinance service, it failed to rein in its advertisements even after realizing that the prevailing economic climate would prevent it from fulfilling its promises to customers. <u>See</u> ¶¶ III(23-25), <u>supra</u>. Its continued promises induced clients and prospective customers to choose IGS over marketplace alternatives, causing them to lose out on prevailing interest rates lower than the interest rates IGS was ultimately able to honor. <u>Id.</u> Even though Zamani knew that consumer complaints were ubiquitous and the secondary market for loans was dry, he made no effort to exercise his control, as Chief Executive Officer, over the continued

advertisement of IGS' loan refinance services.  See id.  His conduct was not born of willfulness but mismanagement, poor delegation of responsibility, and an inability to come to grips with reality as his company floundered and the credit market collapsed.  Since these traits may motivate future misrepresentations in light of the volatility of the credit markets and the financial vulnerability of many prospective consumers of mortgage modification and mortgage refinance products, narrow injunctive relief should be entered to address the "cognizable danger of recurrent violation[s]."  See United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894 (1953).

10.  Though the Court declines to banish Zamani from the mortgage industry, it is appropriate to enjoin Zamani "from making misrepresentations or false representations in the future."  See Goodman v. FTC, 244 F.2d 584, 595-96 (9th Cir. 1957).  To ensure that this injunction is observed, a court can also "order record-keeping and monitoring to ensure compliance" with an order prohibiting further misrepresentations.  FTC v. Think Achievement Corp., 144 F. Supp. 2d 1013, 1017 (N.D. Ind. 2000) (citing FTC v. Sharp, 782 F. Supp. 1445, 1456-57 (D. Nev. 1991)).  Such monitoring provisions should permit the FTC to periodically review personnel records, timely approve hiring decisions (or propose alternatives), and alter advertisements for any services offered by Zamani and/or his agents.  Cf. Sharp, 782 F. Supp. at 1456-57 (entering judgment requiring defendants and their agents to submit their records to FTC inspection).  The Court considers such relief appropriate in this case: though it is not equitable to restrain Zamani from engaging in his trade, the FTC is entitled to ensure that he does not repeat the mistakes that enabled the misconduct at issue.

11.  The FTC also seeks restitutionary relief, the "monetary equivalent" of the

injective relief available under Section 13(b) of the Act, 15 U.S.C. § 57(b).[4]  See

FTC v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1292 (D. Minn. 1985).

"Although [Section 13(b)] does not expressly provide for restitution, several courts

. . . have concluded that [it] allows restitution or other ancillary equitable relief."

FTC v. Verity Intern., Ltd., 443 F.3d 48, 66 & n. 6-8 (2d Cir. 2006) (citing Singer,

668 F.2d at 1113).  In Verity, the Second Circuit held that the amount of restitution

is not "the full amount lost by consumers," but instead "the benefit unjustly

received by the defendants."  See 443 F.3d at 67.  Recent decisions in other

Circuits have endorsed this principle, see Commodity Futures Trading Com'n v.

Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1345 (11th Cir. 2008); FTC v. QT,

Inc., 512 F.3d 858, 863 (7th Cir. 2008), though the Ninth Circuit's decision in FTC

v. Stefanchik, 559 F.3d 924, 931 (9th Cir. 2009) may hold otherwise.  See FTC v.

Medlab, Inc., 615 F. Supp. 2d 1068, 1083 (N.D. Cal. 2009).  The Court need not

resolve this uncertainty because, in this case, the competing legal rules yield the

same result, since the parties do not dispute that "the defendant's gain [if any] will

be equal to the consumer's loss [if any]."  Verity, 443 F.3d at 68.[5]

---

[4] In its proposed findings, the FTC also seeks recovery pursuant to Section 19(b) of the FTC Act, 15 U.S.C. § 57(b)(2).  That section provides: "If any person, partnership, or corporation engages in any un fair or deceptive act or practice . . . with respect to which the Commission has issued a final cease and desist order which is applicable to such person, partnership, or corporation, then the Commission may commence a civil action against such person, partnership, or corporation in a United States district court . . . If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b) of this section."  However, the FTC has not satisfied the Court, as is its burden, that it has satisfied the procedural prerequisites for the issuance of relief under Section 19(b).  See Figgie, 994 F.2d at 603 ("[T]he FTC may, after satisfying procedural requirements, order [a firm] to cease and desist from the violation" prior to seeking relief under Section 19(b)).

[5] Because the distinction drawn in Verity is of no consequence to the disposition of this case, the Court is not limited to awarding profits, and may award IGS' gross receipts.  See FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 14-15 (1st Cir. 2010).

12. Only *unjust* gains are subject to restitution under Section 13(b). Id. at 67. In cases, like this one, alleging mass consumer fraud, the entire amount received from consumers may be subject to restitution if the FTC proves that "the alleged fraudulent practices were the type of misrepresentation on which a reasonably prudent person would rely, that they were widely disseminated, and that the injured consumers actually purchased the product." Kitco, 612 F. Supp. at 1293. However, it is error to simply conclude that the "total amount paid by consumers" constitutes the defendant's unjust enrichment without accounting for refunds and actual services rendered. See id. at 69-70. The FTC bears the burden to present a reasonable estimate of the defendant's unjust enrichment. Id. The Verity court recognized that "[t]he FTC's investigatory power gives it the capacity to estimate with some degree of precision" the number of consumers that purchased, and subsequently failed to obtain the benefits of, a particular product or service. See id. Here, the FTC has established that, after refunds, IGS generated $2,103,099 in revenue from customers that paid the $995 up-front fee in reliance upon IGS' representation that the fee would secure a modified loan through Hope to Homeowners or a refinanced mortgage at specified terms.

13. The FTC seeks to hold Zamani individually liable for this amount of restitution. To do so, the FTC must show that Zamani "had actual knowledge of the material misrepresentations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." FTC v. Garvey, 383 F.3d 891, 900 (9th Cir. 2004). The FTC has made this showing only as to the mortgage refinance service and, even in that case, only for the period of time after IGS reached capacity on its line of credit and struggled to sell its loans on the secondary market. It was during this period of time that IGS continued to disseminate radio and internet advertisements even though the company's executives, including Zamani, were well aware that the company could not fund loans at advertised rates. Zamani's

failure to restrain advertising in the face of the company's failures or jettison his ineffective corporate team was, at best, reckless. Under Garvey, Zamani is therefore liable for restitution for mortgage refinance "up-front" fees collected between April 2009 and June 2009.

14. The FTC argues that Zamani also had knowledge (or constructive knowledge) of IGS' misrepresentations concerning the Hope to Homeowners service. But the evidence establishes that Zamani learned about *consumer complaints* in early 2009, as the service reached its twilight, and that he responded to these complaints by directing sales agents and processors to follow a script when selling the service. See ¶ III(22). Moreover, the consumer complaints, to which the FTC refers, faulted IGS for failing to convince third-party lenders to commit to the federally sponsored Hope for Homeowners program. The FTC has provided no reason (nor is there any) that Zamani should have known in advance that the Hope for Homeowners program, as championed by the Department for Housing and Urban Development, would have proven so unpalatable to third-party lenders. Indeed, the Hope to Homeowners contracts that IGS sent its customers actually cautioned that "there are no express or implied guarantees" about third-party lenders' willingness or ability to modify loan terms. See id. III(5). Because every institutional correspondence by IGS in connection with Hope to Homeowners warned consumers about the risks, and Zamani sought to correct the misrepresentations made by the company's sales agents and processors, the FTC has failed to show that he had the *mens rea* required for restitutionary liability.

15. Under the applicable law, the facts support a limited injunction that subjects Zamani to monitoring and compliance requirements, though it does not restrain him from participating in the mortgage industry. In addition, Zamani is individually liable to restore to the FTC the revenues generated by IGS between April 2009 and June 2009, though restitution does not extend prior to April 2009.

**V.    Disposition**

For the foregoing reasons, judgment is entered against Zamani and for the FTC on Counts I, II, and III of the Complaint. Judgment is further entered against IGS and for the FTC on Counts I, II, and III of the Complaint. Within seven (7) days of this filing, the parties shall submit supplemental findings of fact that identify the evidence in the record concerning the revenues generated by IGS between April 2009 and June 2009. Within seven (7) days of this filing, the FTC shall also submit a proposed permanent injunction that includes monitoring and compliance requirements that are consistent with those identified in Section IV, Paragraph 10 of this Order. Zamani and IGS shall submit written objections, if any, to the FTC's proposed permanent injunction within seven (7) days of the filing of that proposed injunction.

IT IS SO ORDERED.

DATED: June 6, 2011

_____
DAVID O. CARTER
United States District Judge